# EXHIBIT C

Filing # 116298373 E-Filed 11/06/2020 03:06:51 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

ALPINE SECURITIES CORPORATION;
and SCOTTSDALE CAPITAL ADVISORS
CORPORATION,

CASE NO.  **20-CA-8749**   **DIV A**

       Plaintiffs,

vs.

RANDALL JONES; VISION FINANCIAL
MARKETS, LLC; HOWARD ROTHMAN;
DAVID JARVIS; JARVIS LAW GROUP
PLLC; STEVEN GRIBBEN; GRIBBEN &
ASSOCIATES, INC.; ATLAS FINTECH
HOLDINGS CORP.; JOHN SCHIABLE;
KOONCE SECURITIES, LLC; and
FRANKLIN SCOTT KOONCE;

DATE: 11/11/2020
TIME: 3:15 pm
SERVER INTLS: ER

       Defendants.

_____/

## **SUMMONS**

**THE STATE OF FLORIDA**:

TO EACH SHERIFF OF THE STATE:

      **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the
Amended Complaint, upon the Defendant:

          **Vision Financial Markets, LLC**
          **c/o Its Registered Agent Howard Rothman**
          **120 Long Ridge Road 3 North**
          **Stamford, CT 06902**

Each Defendant is required to serve written defenses to the complaint or petition on Plaintiffs'
attorney:

          Kenneth G. Turkel – FBN 867233
          E-mail: kturkel@bajocuva.com
          Secondary E-mail: tdeleo@bajocuva.com
          Shane B. Vogt – FBN 257620
          E-mail: svogt@bajocuva.com
          Secondary E-mail: garnold@bajocuva.com

1

20-CA-8749    DIV A

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193

within twenty (**20**) days after service of this summons on that defendant, exclusive of the day of service, and to file the original of said written defenses with the clerk of this court either before service on Plaintiffs' attorney or immediately thereafter.  If a defendant fails to do so, a default will be entered against the defendant for the relief demanded in the complaint or petition.

**WITNESS** my hand and the seal of said court on _____11/09/2020_____,
2020.

Pat Frank
As Clerk of the Court

By: _____V Phillips_____
　　　　Deputy Clerk

A True Copy Attest

Process Server

2

4829-3236-0657, v. 1

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom

3

des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

***If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Hillsborough County Courthouse, 800 E. Twiggs St., Room 604, Tampa, Florida 33602, (813) 272-7040, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711***.

Plaintiffs' Attorney:

Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
Secondary E-mail: tdeleo@bajocuva.com
Shane B. Vogt – FBN 257620
E-mail: svogt@bajocuva.com
Secondary E-mail: garnold@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 443-2199
Fax: (813) 443-2193

4

Filing # 116298373 E-Filed 11/06/2020 03:06:51 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

ALPINE SECURITIES CORPORATION;
and SCOTTSDALE CAPITAL ADVISORS
CORPORATION,                                          CASE NO.

      Plaintiffs,

vs.

RANDALL JONES; VISION FINANCIAL
MARKETS, LLC; HOWARD ROTHMAN;
DAVID JARVIS; JARVIS LAW GROUP
PLLC; STEVEN GRIBBEN; GRIBBEN &
ASSOCIATES, INC.; ATLAS FINTECH
HOLDINGS CORP.; JOHN SCHIABLE;
KOONCE SECURITIES, LLC; and
FRANKLIN SCOTT KOONCE;

      Defendants.

_____/

## **COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiffs, Alpine Securities Corporation and Scottsdale Capital Advisors Corporation, by

and through their undersigned counsel, hereby sue Defendants, Randall Jones, Vision Financial

Markets, LLC, Howard Rothman, David Jarvis, Jarvis Law Group PLLC, Steven Gribben, Gribben

& Associates, Inc., Atlas FinTech Holdings Corp., John Schiable, Koonce Securities, LLC, and

Franklin Scott Koonce, and allege as follows:

## **PARTIES**

1.    Plaintiff, Alpine Securities Corporation ("Alpine"), is a Utah corporation with its

principal place of business in Salt Lake County, Utah.

2.    Plaintiff, Scottsdale Capital Advisors Corporation ("Scottsdale"), is an Arizona

corporation with its principal place of business in Maricopa County, Arizona.

3.     Alpine and Scottsdale are referred to collectively herein as "Plaintiffs."

4.     Defendant, Randy Jones ("Jones"), is an individual who upon information and belief resides in Fryeburg, Maine.  From approximately June 2011 through January 2019, Jones served as Alpine's Managing Director of Business Development.  From January 2019 through May 2019, Jones served as Scottsdale's Managing Director of Business Development.

5.     Defendant, Vision Financial Markets, LLC ("Vision"), is a Delaware limited liability company with its principal place of business in Stamford, Connecticut.  Vision operates, conducts, and carries on business in the State of Florida through one or more agents in Florida.

6.     Defendant, Howard Rothman ("Rothman"), is an individual who upon information and belief resides in Stamford, Connecticut.  Rothman was at all times material hereto the Chief Executive Officer, Managing Member, and Chief Investment Officer at Vision, and acting within the course and scope of an agency relationship with Vision.

7.     Defendant, David Jarvis ("Jarvis"), is an individual who resides in Novi, Michigan. Jarvis is an attorney licensed to practice law in the state of Michigan.  From approximately March 2017 through August 2018, Jarvis represented and provided legal and consulting services to Plaintiffs.

8.     Defendant, Jarvis Law Group PLLC ("Jarvis Law Group"), is a Michigan professional limited liability company with its principal place of business in West Bloomfield, Michigan. Jarvis owns and operates Jarvis Law Group, through which he represented and provided legal and consulting services to Plaintiffs.  At all times material hereto, Jarvis was acting within the course and scope of an agency relationship with Jarvis Law Group.

9.     Defendant, Steve Gribben ("Gribben"), is an individual who upon information and belief resides in Irvine, California.  Gribben is an attorney licensed to practice law in the state of

California.  From approximately July 2017 through July 2018, Gribben represented and provided legal and consulting services to Plaintiffs.

10.     Defendant, Gribben & Associates, Inc. ("Gribben & Associates"), is a California corporation with its principal place of business in Irvine, California.  Gribben owns and operates Gribben & Associates, through which he represented and provided legal and consulting services to Plaintiffs.  At all times material hereto, Gribben was acting within the course and scope of an agency relationship with Gribben & Associates.

11.     Defendant, Atlas FinTech Holdings Corp. ("Atlas"), is a Florida corporation with its principal place of business in Hillsborough County, Florida.

12.     Defendant, John Schiable ("Schiable"), is an individual who resides in Hillsborough County, Florida.  Schiable was at all times material hereto the Chief Executive Officer, Managing Member, and Chief Investment Officer at Atlas, and acting within the course and scope of an agency relationship with Atlas.

13.     Defendant, Koonce Securities, LLC ("Koonce Securities"), is a Delaware limited liability company with its principal place of business in Bethesda, Maryland.

14.     Defendant, Franklin Scott Koonce ("Koonce"), is an individual who resides in Bethesda, Maryland.  Koonce  was at all times material hereto the Managing Member at  Koonce Securities, LLC, and acting within the course and scope of an agency relationship with Koonce Securities.

15.     Non-Party, Christopher Frankel ("Frankel"), is an individual who resides in Hillsborough County, Florida.  From approximately August 2015 through July 2018, Frankel served as CEO of Alpine, and from August 2018 through October 2018, he was a consultant to Alpine.

## JURISDICTION & VENUE

16.     This is an action for equitable relief and damages in excess of $30,000, exclusive of interest, attorneys' fees, and costs.  Accordingly, this Court has subject matter jurisdiction over this action.

17.     Venue is proper in Hillsborough County, Florida because: a substantial part of the events giving rise to the claims alleged herein occurred in Hillsborough County, Florida; Defendants, Schiable and Atlas, reside in and/or have or usually keep an office for the customary transaction of business in Hillsborough County, Florida; all Defendants were doing business through an agent or other representative who has or usually keeps an office for the customary transaction of business in Hillsborough County, Florida; and/or the causes of action alleged herein accrued in Hillsborough County, Florida.

18.     Defendants, Jones, Vision, Rothman, Jarvis, Jarvis Law Group, Gribben, Gribben & Associates, Koonce, and Koonce Securities, engaged in numerous contacts with Frankel, Atlas, and/or Schiable while Frankel, Atlas, and/or Schiable were located in the state of Florida, and these contacts were for purposes of discussing and carrying out the misconduct, business relationships, agreements and conspiracy upon which this action is based.

19.     Defendants, Jones, Vision, Rothman, Jarvis, Jarvis Law Group, Gribben, Gribben & Associates, Koonce, and Koonce Securities, also knowingly and intentionally entered into an agreement or agreements with Frankel, Atlas, and/or Schiable, pursuant to which Frankel, Atlas, and/or Schiable engaged in acts and conduct which Jones, Vision, Rothman, Jarvis, Jarvis Law Group, Gribben, Gribben & Associates, Koonce and Koonce Securities knew would take place in the state of Florida.

4

20.     Defendants, Jones, Vision, Rothman, Jarvis, Jarvis Law Group, Gribben, Gribben & Associates, Koonce, and Koonce Securities, at various times material to this action, engaged in misconduct alleged herein by and through Frankel, while Frankel was located in the state of Florida.

21.     Defendants, Jones, Vision, Rothman, Jarvis, Jarvis Law Group, Gribben, Gribben & Associates, Atlas, Schiable, Koonce, and Koonce Securities, knowingly and intentionally encouraged, aided, abetted, and/or conspired with Frankel to breach legal and contractual duties to be performed by Frankel in the state of Florida, and also entered into contractual relationships with Frankel that envisioned continuing and wide-reaching contacts with and in the state of Florida.

22.     As more specifically alleged throughout this Complaint, this Court has personal jurisdiction over Defendants under § 48.193, Florida Statutes, because they each personally, in concert with one another, and/or through an agent or co-conspirator, engaged in one or more of the following acts:

     a.    committing tortious acts within the state of Florida;

     b.    committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

     c.    operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in this state;

     d.    engaging in substantial and not isolated activity within the state of Florida; and/or

     e.    engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and/or engaging in overt acts in furtherance of that conspiracy within the state of Florida.

23.     As more specifically alleged throughout this Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy the Due Process under the U.S. Constitution because Defendants have: engaged in substantial and not isolated activity within and/or directed at the state of Florida; reside, maintain offices and/or acted through agents who reside in the state of Florida; and/or committed or conspired to commit intentional torts expressly aimed at Florida, the effects and harms of which were calculated to and did cause injury within the state of Florida.   Accordingly, Defendants should have reasonably anticipated being sued in the state of Florida.

24.     At all relevant times, the Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them are, and at all material times herein mentioned were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.   At all relevant times, the acts, failures to act, and misconduct herein alleged of each Defendant were known to, authorized, approved, and/or ratified by the other said Defendants, and each of them, and/or such acts, omissions, and misconduct were engaged in by the Defendants in concert or active participation with one another or in order to aid or abet one another; and all Defendants knew that certain acts, failures to act, and misconduct herein alleged would occur in Florida.

25.     Defendants entered into and engaged in a conspiracy and business relationships, in furtherance of which they, their agents, and/or their co-conspirators engaged in acts within the state of Florida, such that Defendants could have reasonably anticipated that their co-conspirators' actions connected their conspiracy to Florida in a meaningful way.

26.     The actions, failures to act, and misconduct herein alleged of each Defendant produced and/or contributed substantially to producing the damages, injuries and harms Plaintiffs seek to recover through this action.

## GENERAL ALLEGATIONS

### Alpine, Scottsdale, and the Microcap Industry

27.     Alpine and Scottsdale are two of the largest firms in the "microcap" securities market.   "Microcap" stock refers to companies with law or "micro" capitalizations.   Many microcap stocks trade in the "over-the-counter" (OTC) market, and are quoted on OTC systems.

28.     Alpine is a registered broker-dealer that is an industry leader for clearing over-the-counter stock, and Scottsdale is a brokerage firm that trades microcap securities. Scottsdale introduces customers on a fully disclosed basis to Alpine and clears and settles customer trades through Alpine as the clearing firm.

29.     Alpine and Scottsdale have numerous common customers and are related by common indirect beneficiary ownership.

### Jones's Duties and Obligations to Plaintiffs

30.     In 2011, Alpine hired Jones to manage trading and sales of its direct customer business and to perform various other compliance duties.  In 2012, Jones served as an analyst and member of Alpine's compliance department.  From September 2012 until January 2019, Jones served as Alpine's Managing Director of Business Development.  Jones's responsibilities at Alpine included, *inter alia,* customer trading, customer development, and customer relations.

31.     Throughout his time working for Plaintiffs, Jones was continuously exposed to and entrusted with information that is commercially valuable to Alpine and not generally known or readily ascertainable in the broker-dealer securities industry or the public at large, including, *inter*

*alia*, Alpine's client list and information about Alpine's customers' backgrounds, business activities, predilections, and trading activities (collectively, "Alpine's Customer Information").

32.    Alpine's Customer Information is an invaluable compilation of information and data concerning businesses and individuals who participate in the microcap industry and their trading activity, which enables Alpine to successfully compete in its industry.  Alpine's Customer Information also gives Alpine valuable competitive advantages over its competitors in the microcap marketplace.

33.    Alpine's Customer Information has been gathered and compiled over the course of more than 30 years at great expense to the company.  Among other things, it includes private and confidential information regarding the clients' trade histories, taxes, trust holdings, salaries, pensions, beneficial owners, and control people.  Such information is not generally known to the public or in the industry, and would only be discoverable, if at all, by extraordinary effort and expense.

34.    In addition, Alpine's Customer Information includes such information as client names, available funds, stock activities, current investment holdings/balances, trade confirmations, incurred commissions and fees, trade confirmations, investment objectives and experiences, account values, wiring information, money positions, and predefined compliance reports.

35.    Alpine has taken numerous steps to maintain the secrecy of its Customer Information, including, *inter alia*, requiring all employees to sign confidentiality agreements and making all of its computers password-protected.

36.    In April 2015, Alpine created a formal, written Employee Agreement on Confidentiality and Use of Company Property ("Alpine NDA") that all employees were required to review and sign as a condition of employment or continued employment.  Alpine created the

8

Alpine NDA in order to ensure that its employees understood their obligation and duty to maintain the confidentiality of Alpine's Customer Information and other confidential and proprietary business information, and to only use such information for Alpine's business.

37.     On or about April 16, 2015, Jones executed the Alpine NDA, a true and correct copy of which is attached hereto as **Exhibit A**.

38.     As acknowledged in the Alpine NDA, Jones was exposed to and obligated to maintain the confidentiality and secrecy of Alpine's "Confidential Information," which generally included "material information, in whatever format or media it may be prepared, stored, or retained… that is commercially valuable to [Alpine] with respect to its business [and] is not generally known or readily ascertainable in the busines of [Alpine], as a general matter is protectable as a 'trade secret' under the law of the respective jurisdictions in which [Alpine] conducts its business."

39.     Jones's Alpine NDA also specifically identified several categories of "Confidential Information" to which Jones was exposed and obligated to maintain the confidentiality and secrecy of:

> (a)     technical information concerning [Alpine's] products and services, including product know-how, proprietary designs, and documentation, software code, and the results of research and studies, projects and product development along with technical memoranda and correspondence;
>
> (b)     information concerning [Alpine's] business and operations, including financial and accounting information, sales records, business plans, markets and marketing methods, customer lists and information, suppliers and supplier information and marketing plans, methods, and strategies;
>
> (c)     information concerning [Alpine's] employees in connection with their employment by [Alpine];

(d)    information submitted by [Alpine's] customers, suppliers, employees, consultants or co-venture partners for study, evaluation or use.

40.    The Alpine NDA also imposed obligations on Jones concerning the access and use of Alpine's information technology systems, computers, data processing, electronic communications equipment, internal and external network systems, and electronic equipment (collectively, "ECS").  Among other things, Jones agreed that access and use of Alpine's ECS was limited to purposes related to his duties and responsibilities, official business, and activities approved by Alpine.  Jones further agreed that ECS information or messages created, sent, received or stored using Alpine's ECS were Alpine's property.  The Alpine NDA also specifically prohibited Jones from, among other things, helping unauthorized persons gain access to Alpine's computers and information assets and using the system for commercial ventures and private profit.

41.    Jones's obligations under the Alpine NDA to maintain the confidentiality and security of Confidential Information expressly survived the termination of his employment.

42.    By virtue of his position at Alpine, Jones had access to Alpine's Confidential Customer Information and other "Confidential Information" under his Alpine NDA.

43.    In January 2019, Jones left Alpine and started working at Scottsdale as its "Managing Director of Business Development" where his responsibilities included, *inter alia,* customer relations and business development.  Among other things, Jones pursued new customers, serviced existing customers, and reviewed certificates of deposits received by Scottsdale from its customers. Consequently, Jones was exposed to and entrusted with confidential client information that is commercially valuable to Scottsdale and not generally known or readily ascertainable in the broker-dealer securities industry or to the public at large, including, *inter alia*, client names and personnel, available funds, stock activities, current investment holdings/balances, incurred

10

commissions and fees, trade confirmations, investment objectives and experiences, account values, wiring information, and money positions (collectively, "Scottsdale's Client Information").

44.     Scottsdale's Client Information is an invaluable compilation of information and data concerning Scottsdale's customers and clients that enables it to successfully compete in its industry and gives Scottsdale valuable competitive advantages over its competitors in the microcap marketplace.

45.     Scottsdale's Client Information includes, among other things, information regarding hundreds of customers and has been compiled over the course of more than 18 years at great expense to the company, such as information regarding Scottsdale's clients' holdings, trading histories, beneficial owners, and control people.  Such information is not generally known to the public or in the industry, and would only be discoverable, if at all, by extraordinary effort and expense.

46.     Once Jones started working at Scottsdale, he received a copy of Scottsdale's written supervisory procedures ("Scottsdale's WSP").

47.     Scottsdale's WSP provides in relevant part:

> It is the obligation of Firm and each of its Associated Persons to respect and protect the right to privacy of all the customers.
> Confidential or proprietary information, obtained in the course of an individual's association or employment with the Firm, is not to be used for personal gain or to be shared with others for personal benefit. . . .
> All customer information including financial condition, plans, proposals, and prospectuses are considered confidential information and will not be disclosed to anyone outside of the Firm's designated personnel. . . .
> Upon termination, the Associated Person shall return . . . all Firm property including, without limitation, office keys, computer files, customer files, and any other materials deemed confidential or proprietary by Firm.

48.     Scottsdale's WSP further provides that all files are locked in a secure area, access to computers is limited to authorized persons with passwords to control access to files, and websites that employees use to access customer information are password protected.

49.     Jones resigned from Scottsdale on May 17, 2019.

## Christopher Frankel's Duties & Obligations to Plaintiffs

50.     In 2015, Plaintiffs hired Frankel to serve as Chief Executive Officer of Alpine, and he assumed a position as a member of its Board.  From approximately August 2015 through July 2018, Frankel served as CEO and Board Member of Alpine.  From August 2018 through October 2018, Frankel was a consultant to Alpine.

51.     Throughout his time working for Alpine, Frankel was continuously exposed to and entrusted with information that is commercially valuable to Plaintiffs and not generally known or readily ascertainable in the broker-dealer securities industry or the public at large, including *inter alia*, Alpine's Customer Information, Scottsdale's Client Information, and other confidential and proprietary information concerning Plaintiffs' business practices, financial relationships and terms of those relationships, pricing information, and private financial information of Plaintiffs and their clients.

52.     Frankel, like Jones, entered into written non-disclosure and confidentiality agreements which were put in place to protect Plaintiffs' numerous trade secrets and confidential information.

53.     In June 2015, before he began working at Alpine, Frankel executed a Non-Disclosure and Confidentiality Agreement ("Frankel's Initial NDA") with Plaintiffs, a true and correct copy of which is attached as **Exhibit B**.  Plaintiffs required Frankel to enter into his Initial NDA in connection with their discussions about hiring Frankel to help run their broker-dealer

business.  During that process, Frankel was entrusted with and exposed to highly confidential and commercially valuable information and trade secrets.

54.     As acknowledged in his Initial NDA, Frankel was given access to information that is Plaintiffs' "sole property" "and highly confidential in nature."

55.     Frankel's Initial NDA defined "Confidential Information" as follows:

> "Confidential Information" means any data or information that is proprietary to the [Plaintiffs] and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services, (iii) customer lists and account information; (iv) any scientific or technical information, invention, design,
> process, procedure, formula, improvement, technology or method; (v) any concepts, reports, data, know-how, works in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (vi) any other information that should reasonably be recognized as confidential information of the [Plaintiffs].

56.     Pursuant to his Initial NDA, Frankel agreed to "keep all Confidential Information strictly confidential by using a reasonable degree of care [and]… not disclose any Confidential Information received by [him] to any third parties."  Frankel further agreed "to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of an authorized representative of [Plaintiffs]."

57.     On July 1, 2015, after Frankel was hired, he also entered into an Employee Non-Disclosure & Computer Use Agreement with Alpine and Scottsdale, a true and correct copy of which is attached as **Exhibit C** (the "Employee NDA").

58.    As acknowledged in Frankel's Employee NDA, he was exposed to Plaintiffs' "Confidential Information" as part of his employment, which generally included "all written or oral information of a proprietary, intellectual or similar nature relating to [Plaintiffs] business, projects, operations, activities or affairs whether of a technical or financial nature or otherwise."

59.    Frankel's Employee NDA also specifically identified several categories of "Confidential Information" to which Frankel was exposed and was obligated to maintain the confidentiality and secrecy of:

    (a)    technical information concerning Company's products and services, including product know-how, formulas, designs, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

    (b)    information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

    (c)    information concerning Company's employees, including salaries, strengths, weaknesses and skills;

    (d)    information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

    (e)    any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

60.    In his Employee NDA, Frankel agreed to keep all of Plaintiffs' Confidential Information in the strictest confidence and that he would not disclose such information to anyone outside Plaintiffs without their prior written consent.

61.    Frankel also expressly agreed in his Employee NDA not to make use of any Confidential Information for his own purposes or for the benefit of anyone other than Plaintiffs

62.   Frankel's Employee NDA further provides that he would promptly return all of Plaintiffs' Confidential Information upon the termination of his employment, and that his confidentiality obligations survived the termination of his employment.

63.   Like Jones, Frankel also agreed in his Employee NDA to restrictions on his access and use of Plaintiffs' ECS.  Among other things, Frankel agreed that access and use of the ECS was limited to purposes related to his duties and responsibilities, official business, and approved activities for Plaintiffs.  Frankel further agreed that all information or messages created, sent, received or stored using the ECS were Plaintiffs' property.  The Employee NDA also specifically prohibited Frankel from, among other things, using the ECS system for commercial ventures or private profit, transmitting confidential information to non-company e-mail addresses, and accessing personal e-mail accounts.

64.   Throughout his time working for Alpine, Frankel was continuously exposed to and entrusted with "Confidential Information" from each of the Plaintiffs, including *inter alia*, Alpine's Customer Information, Scottsdale's Client Information, and other commercially valuable information not generally known or readily ascertainable in the broker-dealer securities industry or to the public at large.

### Jarvis' and Gribben's Duties and Obligations to Plaintiffs

65.   Jarvis and Jarvis Law Group served as attorneys and consultants for Alpine and Scottsdale from March 2017 through August 2018.

66.   On March 15, 2017, Jarvis and Jarvis Law Group entered into a Consulting Agreement with Alpine, a true and correct copy of which is attached as **Exhibit D** ("Jarvis's Consulting Agreement"), pursuant to which they agreed to perform consulting and legal services for Alpine and Scottsdale.

67.     Among other things, Jarvis and Jarvis Law Group agreed in their Consulting Agreement to perform legal and consulting services in a number of areas, such as responding to and advising executive management regarding regulatory inquiries and investigations, working on processes and procedures for microcap securities, compliance, and other matters as directed by Plaintiffs' CEO.

68.     Jarvis and Jarvis Law Group further acknowledged that in the performance of the services contemplated under their Consulting Agreement, they would and did have access to or possess Confidential Information, and they expressly agreed not to disclose, and to maintain in strictest confidence, Plaintiffs' Confidential Information.

69.     Jarvis's Consulting Agreement generally defined "Confidential Information" as "information, in whatever format or media it may be prepared, stored or retained… that is commercially valuable to [Plaintiffs'] with respect to its business, is not generally known or readily ascertainable to third parties in connection with the business of [Plaintiffs].

70.     Jarvis's Consulting Agreement also specifically identified several categories of "Confidential Information" to which Jarvis and Jarvis Law Group were exposed and was obligated to maintain the confidentiality and secrecy of:

> (i)     information concerning Company's business and operations, including financial and accounting information, sales records, business plans, markets and marketing methods, customer lists and customer information, suppliers and supplier information and marketing plans, methods and strategies;
>
> (ii)    technical information concerning Company's products and services, including product know-how, proprietary designs and documentation, and results of research and studies, projects and product development along with technical memoranda and correspondence;
>
> (iii)   information concerning Company's employees in connection with their employment by Company;

(iv)    information submitted by Company's customers, suppliers, employees, consultants or co-venture partners for study, evaluation or use;

(v)    information that is protectable as a "trade secret" under the law of the respective jurisdictions in which the Company conducts its business;

(vi)    other data or information which is proprietary to the Company, or has been developed by and at the expense of the Company, and is not generally known to the public, whether in tangible or intangible form;

(vii)    any marketing strategics, plans, financial information, or projections, operations, sales estimates. business plans and performance results relating to the past, present or future business activities of the Company or its affiliates;

(viii)    customer lists and account information;

(ix)    any scientific or technical information, invention, design, process, procedure, technology or technology-based method;

(x)    any concepts, data, know-how, specifications, computer software, source code, object code, now charts, databases, inventions, information and trade secrets;

(xi)    any legally confidential or privileged communications or information; and

(xii)    any other information that should reasonably be recognized as confidential information of the Company, whether or not novel, unique, patentable, copyrightable.

71.    Jarvis and Jarvis Law Group agreed to use Plaintiffs' Confidential Information "only in the performance of his Agreement," and that they would provide Confidential Information "only to those persons who have a need to know in the performance of this Agreement."

72.    Jarvis and Jarvis Law Group further agreed in their Consulting Agreement that their obligation to maintain the confidentiality and secrecy of Plaintiffs' Confidential Information "shall remain in full force and effect during and after termination of this Agreement."

73.     Also, by virtue of providing legal services to Plaintiffs, Jarvis and Jarvis Law Group owed Plaintiffs a duty to maintain and protect the secrecy of any information and communications to which they were exposed during the course of the professional relationship between Jarvis and Jarvis Law Group and Plaintiffs.

74.     In the course of providing consulting and legal services to Plaintiffs, Jarvis and Jarvis Law Group gained access to, among other things, Alpine's Customer Information, Scottsdale's Client Information, and other confidences, information, and secrets related to Plaintiffs' businesses, operations, legal issues and proceedings, and other similar matters.

75.     Under their Consulting Agreement and by virtue of their attorney-client relationship with Plaintiffs, Jarvis and Jarvis Law Group were obligated to maintain and protect Plaintiffs' Confidential Information, confidences, confidential and proprietary business information, and secrets, and also prohibited from revealing them, using them to Plaintiffs' disadvantage, and/or using them for their advantage or the advantage of any third-party.

76.     Gribben and Gribben & Associates served as attorneys and consultants for Alpine from July 2017 through July 2018.  On July 12, 2017, Gribben and Gribben & Associates entered into a Consulting Agreement with Alpine, a true and correct copy of which is attached as **Exhibit E** ("Gribben's Consulting Agreement"), pursuant to which they agreed to provide legal and consulting services for Plaintiffs.

77.     Among other things, Gribben and Gribben & Associates agreed in their Consulting Agreement to perform legal and consulting services in a number of areas, such as reviewing prospective and ongoing deposits of securities and securities transactions of customers, spearheading the development of policies and procedures for placement agent and investment banking businesses, and assisting in the performance of due diligence related to the same.

78.     Gribben and Gribben & Associates further acknowledged that in the performance of the services contemplated under their Consulting Agreement to Plaintiffs, they would and did have access to or possess Confidential Information, and they expressly agreed not to disclose, and to maintain in strictest confidence, Plaintiffs' Confidential Information.

79.     Gribben's Consulting Agreement generally defined "Confidential Information" as "information, in whatever format or media it may be prepared, stored or retained... that is commercially valuable to [Plaintiffs'] with respect to its business, is not generally known or readily ascertainable to third parties in connection with the business of [Plaintiffs].

80.     Gribben's Consulting Agreement also specifically identified several categories of "Confidential Information" to which Gribben and Gribben & Associates were exposed and obligated to maintain the confidentiality and secrecy of:

(i)     information concerning Company's business and operations, including financial and accounting information, sales records, business plans, markets and marketing methods, customer lists and customer information, suppliers and supplier information and marketing plans, methods and strategies;

(ii)    technical information concerning Company's products and services, including product know-how, proprietary designs and documentation, and results of research and studies, projects and product development along with technical memoranda and correspondence;

(iii)   information concerning Company's employees in connection with their employment by Company;

(iv)    information submitted by Company's customers, suppliers, employees, consultants or co-venture partners for study, evaluation or use;

(v)     information that is protectable as a "trade secret" under the law of the respective jurisdictions in which the Company conducts its business;

(vi)    other data or information which is proprietary to the Company, or has been developed by and at the expense of the Company, and is not generally known to the public, whether in tangible or intangible form;

(vii)    any marketing strategics, plans, financial information, or projections, operations, sales estimates. business plans and performance results relating to the past, present or future business activities of the Company or its affiliates;

(viii)    customer lists and account information;

(ix)    any scientific or technical information, invention, design, process, procedure, technology or technology-based method;

(x)    any concepts, data, know-how, specifications, computer software, source code, object code, now charts, databases, inventions, information and trade secrets;

(xi)    any legally confidential or privileged communications or information; and

(xii)    any other information that should reasonably be recognized as confidential information of the Company, whether or not novel, unique, patentable, copyrightable.

81.    Gribben and Gribben & Associates agreed to use Plaintiffs' Confidential Information "only in the performance of his Agreement," and that they would provide Confidential Information "only to those persons who have a need to know in the performance of this Agreement."

82.    Gribben and Gribben & Associates further agreed in their Consulting Agreement that their obligation to maintain the confidentiality and secrecy of Plaintiffs' Confidential Information "shall remain in full force and effect during and after termination of this Agreement."

83.    Also, by virtue of providing legal services to Plaintiffs, Gribben and Gribben & Associates owed Plaintiffs a duty to maintain and protect the secrecy of any information and

communications to which they were exposed during the course of their attorney-client relationship with Plaintiffs.

84.     In the course of providing consulting and legal services to Plaintiffs, Gribben and Gribben & Associates gained access to, among other things, Alpine's Customer Information, Scottsdale's Client Information, and other confidences, information, and secrets related to Plaintiffs' businesses, operations, legal issues and proceedings, and other similar matters.

85.     Under their Consulting Agreement and by virtue of their attorney-client relationship with Plaintiffs, Gribben and Gribben & Associates were obligated to maintain and protect Plaintiffs' Confidential Information, confidences, confidential and proprietary business information, and secrets, and also prohibited from revealing them, using them to Plaintiffs' disadvantage, and/or using them for their advantage or the advantage of any third-party.

**The Conspiracy to Sabotage and Steal Plaintiffs' Microcap Business**

86.     In the later half of 2017, Frankel, Jones, Jarvis, and Gribben devised and started to implement a plan to sabotage and steal Plaintiffs' OTC business.

87.     As part of that plan, Frankel, Jones, Jarvis, and Gribben set out to gain access to and use Plaintiffs' Confidential Information for their own personal gain and benefit, and for the gain and benefit of others, so they could start-up and/or work for a new business or businesses in the microcap industry using Plaintiffs' Confidential Information, Alpine's Customer Information, Scottsdale's Client Information, and Plaintiffs' clients and customers as the foundation for the new business operations.

88.     On numerous occasions, without Plaintiffs' knowledge or consent, Frankel, Jones, Jarvis, and Gribben accessed and/or used, and conspired with one another and with Defendants, Vision, Rothman, Atlas, Schiable, Koonce, and Koonce Securities, to access and use Plaintiffs'

Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, with the goal of sabotaging and stealing Plaintiffs' OTC business and customers.

89.     In or about July 2017, while he was still working for Plaintiffs, Frankel entered into an agreement with Schiable and Atlas to provide consulting services in connection with the acquisition of Koonce Securities; an acquisition through which Frankel, Schiable, Atlas, Koonce, and Koonce Securities agreed and conspired to access and use Plaintiffs' Confidential Information to try to start a competing business and steal Plaintiffs' clients.

90.     As part of that relationship and endeavor, which continued upon information and belief into 2020, Atlas, Schiable, Koonce, Koonce Securities, and Frankel conspired to and did use and disclose Plaintiffs' Confidential Information, including without limitation Alpine trade runs and other similar information, to provide documentation needed for the regulatory approval process associated with Atlas's acquisition of Koonce Securities.

91.     During that relationship and endeavor, Schiable, Atlas, Koonce, and Koonce Securities knew or should have known about Frankel's confidentiality obligations owed to Plaintiffs and that Frankel was breaching those obligations by using and disclosing Plaintiffs' Confidential Information.

92.     Similarly, Frankel, Jones, Jarvis, and Gribben also conspired to and did, without Plaintiffs' knowledge or consent, use and disclose Plaintiffs' Confidential Information in connection with the attempted acquisition of broker-dealer, ZIV Investment Company ("ZIV"), through which they also intended to use Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information to sabotage and steal Plaintiffs' business and start a competing business.

93.     As part of the attempted acquisition of ZIV, Frankel, Jones, Jarvis and Gribben conspired to and did use and disclose Plaintiffs' Confidential Information, including without limitation Alpine trade runs and other similar information, to provide documentation needed for the regulatory approval process associated with acquiring ZIV.

94.     Throughout the attempted acquisitions of Koonce and ZIV, Jones, Jarvis, and Gribben were fully aware of the legal and contractual obligations they and Frankel owed to Plaintiffs under their respective agreements and professional relationships with Plaintiffs.

95.     Throughout the attempted acquisitions of Koonce and ZIV, Schiable, Atlas, Koonce, and Koonce Securities were fully aware of the legal and contractual obligations Frankel, Jones, Jarvis, and Gribben owed to Plaintiffs under their respective agreements and professional relationships with Plaintiffs, and also knew the acts Frankel, Jones, Jarvis, and Gribben were engaging in were in violation of these obligations owed to Plaintiffs.

96.     During 2018-2019, Alpine was pursuing an omnibus clearing arrangement with Vision, which would allow Alpine to clear securities under its own name for the benefit of its clients, thereby avoiding certain charges levied by the National Securities Clearing Corporation and Depository Trust & Clearing Corporation.

97.     Because Jones ran the trading desk at Alpine, he spearheaded these discussions on behalf of Alpine with Rothman at Vision. Jones began these discussions while he was associated with Alpine, and continued the discussions with Vision and Rothman while at Scottsdale. Because Jones' job included developing and managing customer relations, both at Alpine and Scottsdale, he had access to their entire book of business.

98.     Although the Alpine-Vision omnibus clearing negotiations appeared promising and were expected to result in an agreement, by April 2019, Alpine was told that Vision had cooled on the arrangement for reasons then-unknown to Alpine.

99.     When Vision withdrew from the negotiations associated with the proposed omnibus agreement, it represented that it was no longer interested in the microcap or over-the-counter bulletin board markets.  However, this representation later proved to be false.

100.    In fact, and unbeknownst to Plaintiffs, Frankel, Jones, and Jarvis were conspiring with one another and with Rothman and Vision to access and use Plaintiffs' Confidential Information to create a new business group at Vision and induce Alpine's clients to transfer their business from Alpine to Vision.

101.    In conjunction with those efforts, Frankel, Jones, and Jarvis were also using and disclosing other Confidential Information under their respective agreements with Plaintiffs to try to convince customers that Alpine was failing and going out of business.

102.    In connection with their conspiracy with Vision and Rothman, Frankel, Jarvis, and Jones also wrongfully retained Plaintiffs' Confidential Information, including without limitation Alpine's Customer Information and Scottsdale's Client Information, and used it to solicit clients and create a microcap/OTC "Group" at Vision; all with the knowledge, consent, and assistance of Vision and Rothman, and in breach of their respective agreements with and violation of their legal duties owed to Plaintiffs.

103.    Jones also facilitated access to and the use of Plaintiffs' Confidential Information for his and his co-conspirators' benefit while still working for Plaintiffs, and then failed to return and protect the secrecy of other Confidential Information, such as customer and client lists, when he terminated his employment with Alpine and Scottsdale.

104.    The misappropriation of Plaintiff's Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, by Jones, Jarvis, and Frankel, the provision of it to Vision, and the use of it to benefit Vision, constituted a flagrant theft and improper use of that information allowing Vision, through the efforts of Jones, Frankel, Jarvis, and Rothman, to undercut Plaintiffs' commission structures and weaponize the client information against Plaintiffs.

105.    Soon after Frankel started working with Vision, Jones and Jarvis followed.  Prior to that point, Vision had not previously solicited Plaintiffs' customers.

106.    Vision only started soliciting Plaintiffs' clients after the conspiracy and agreement to misappropriate Plaintiffs' Confidential Information was implemented, for the benefit of Vision and through the efforts and assistance of Rothman.

107.    In May 2019, Plaintiffs learned that several of their clients had been contacted by Jones, who contacted these customers bring their accounts to Vision.

108.    In fact, on or about May 28, 2019, an Alpine business consultant spoke to Jones, who stated that he was, in fact, working at Vision, and freely acknowledged that he was trying to solicit Plaintiffs' clients to move their business to Vision.

109.    Vision's Chief Compliance Officer even admitted that Vision hired Frankel, Jones, and Jarvis to take Alpine's clients.

110.    Defendants, Atlas, Schiable, Koonce, Koonce Securities, Vision, and Rothman encouraged, aided, and/or abetted Frankel, Jones, Jarvis, and Gribben to use Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information to try to start competing businesses and steal Plaintiffs' clients, even though they knew or should have known that Frankel, Jones, Jarvis, and Gribben had contractual and legal obligations and duties that prevented their retention, use, and disclosure of such information.

25

111.    As part of his agreement to work for Vision, Frankel openly discussed his confidentiality obligations and agreements with Vision and Rothman.

112.    Similarly, Vision and Rothman knew or should have known that Jones and Jarvis were bound by confidentiality agreements with Plaintiffs, Scottsdale's WSP (as such written supervisory procedures are mandated by FINRA), and other legal duties.

113.    Notwithstanding their knowledge of the confidentiality obligations Frankel, Jones, Jarvis, and Gribben owed to Plaintiffs, Atlas, Schiable, Koonce, Koonce Securities, Vision, and Rothman encouraged Frankel, Jones, Jarvis, and Gribben to exploit Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information so they could sabotage and steal Plaintiffs' business and benefit financially.

114.    Defendants knowingly and intentionally agreed and conspired with one another to illegally use Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information for their own benefit.

115.    As a direct and proximate result of Defendants actions, Plaintiffs suffered and will continue to suffer damages, economic harm, loss of business, lost profits, and similar harms.

116.    Also as a direct and proximate result of Defendants' above-described actions, Plaintiffs have suffered and will continue to suffer irreparable harm unless Defendants' unlawful, illegal, and tortious misconduct is enjoined.

117.    Defendants' damaging conduct is continuing in nature and ongoing today, in part as they continue to do business with and target Plaintiffs' customers they only were able to ascertain and obtain with the use of Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information.

118.    The illegal scheme to which Defendants each agreed was accomplished through breaches of the above-described confidentiality agreements and obligations owed to Plaintiffs, violations of legal duties owed to Plaintiffs, and the misappropriation of Plaintiffs' confidential, proprietary, and/or trade secret client information.

119.    With the advantage of Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, Defendants directly targeted potential clients that they knew actively used broker-dealer services, and therefore did not have to spend the time and resources that would have been required to independently identify and contact these clients – time and resources that Plaintiffs had spent developing its database and client list information.

120.    All conditions precedent to the filing and maintenance of this action have occurred, been performed, or have been waived.

121.    Plaintiffs have retained the undersigned attorneys to represent them in this action and are obligated to pay them a reasonable fee for their services.

### COUNT I
### (Breach of Contract)
### (Plaintiffs against Jones)

122.    Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

123.    Plaintiffs entered into valid and binding contracts with Jones, as more specifically set forth in paragraphs 30-48, above.

124.    Plaintiffs fully performed their obligations under these contracts with Jones.

125.    Jones materially breached his contracts with Plaintiffs by disclosing, using, failing to return, and failing to protect Plaintiffs' Confidential Information.

126.    Jones's breaches of his contracts with Plaintiffs are material and without justification.

127.    As a direct and proximate result of Jones's breaches, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, as well as irreparable harm.

### COUNT II
**(Breach of Contract)**
**(Plaintiffs against Jarvis & Jarvis Law Group)**

128.    Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

129.    Plaintiffs entered into a valid and binding contract with Jarvis and Jarvis Law Group, as more specifically set forth in paragraphs 65-75, above.

130.    Plaintiffs fully performed their obligations under their contract with Jarvis and Jarvis Law Group.

131.    Jarvis and Jarvis Law Group materially breached their contract with Plaintiffs by disclosing, using, failing to return, and failing to protect Plaintiffs' Confidential Information.

132.    Jarvis's and Jarvis Law Group's breaches of their contract with Plaintiffs are material and without justification.

133.    As a direct and proximate result of Jarvis's and Jarvis Law Group's breaches, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, as well as irreparable harm.

## COUNT III
### (Breach of Contract)
### (Plaintiffs against Gribben and Gribben & Associates)

134.    Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

135.    Plaintiffs entered into a valid and binding contract Gribben and Gribben & Associates, as more specifically set forth in paragraphs 76-85, above.

136.    Plaintiffs fully performed their obligations under their contract with Gribben and Gribben & Associates.

137.    Gribben and Gribben & Associates materially breached their contract with Plaintiffs by disclosing, using, failing to return, and failing to protect Plaintiffs' Confidential Information.

138.    Gribben's and Gribben & Associates' breaches of their contract with Plaintiffs are material and without justification.

139.    As a direct and proximate result of Gribben's and Gribben & Associates' breaches, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, as well as irreparable harm.

## COUNT IV
### (Breach of Fiduciary Duty)
### (Plaintiffs against Jones)

140.    Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

141.    By virtue of his role as Alpine's Managing Director of Business Development, Alpine's representative in negotiating the omnibus clearing agreement with Vision, and Scottsdale's Managing Director of Business Development, Jones owed fiduciary duties to

Plaintiffs, including a duty of loyalty, a duty to act in the best interests of Plaintiffs, and an obligation to act in good faith in all matters related to their work with Plaintiffs.

142.   As set forth above, Jones breached his fiduciary duties and advanced his own interests to the detriment of Plaintiffs by misappropriating Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, conspiring with his Co-Defendants and Frankel to use the information misappropriated from Plaintiffs to sabotage and steal Plaintiffs' business, and failing to inform Plaintiffs about the misconduct of Frankel while Jones was still working for Plaintiffs.

143.   Jones further breached his fiduciary duties to Plaintiffs by failing to advance Alpine's interests in the negotiations with Vision regarding the omnibus clearing agreement, and instead advancing his own interests and those of Frankel and his Co-Defendants, to the determent of Alpine, by conspiring with them to steal Alpine's clients and bring them to Vision through the misappropriation of Plaintiffs' Confidential Information.

144.   As a direct and proximate result of Jones' breaches of his fiduciary duties, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, as well as irreparable harm.

145.   Jones' misconduct was not in good faith, reasonable or prudent, was in reckless disregard of Plaintiffs' rights, or was an intentional and wanton violation of Plaintiffs' rights.

## COUNT V
### (Breach of Fiduciary Duty)
### (Plaintiffs against Jarvis & Jarvis Law Group)

146.   Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

147.     By virtue of their roles as consultants and legal counsel to Plaintiffs, Plaintiffs held Jarvis and Jarvis Law Group in a position of trust and confidence and they owed fiduciary duties to Plaintiffs, including a duty of confidentiality, a duty of loyalty, a duty to act in Plaintiffs' best interests, and an obligation to act in good faith in all matters related to their work with Plaintiffs.

148.     As set forth above, Jarvis and Jarvis Law Group breached their fiduciary duties and advanced their own interests to the detriment of Plaintiffs by misappropriating and failing to protect Plaintiffs' Confidential Information, conspiring with each of their Co-Defendants and/or Frankel to use the  Confidential Information misappropriated from Plaintiffs to sabotage and steal Plaintiffs' business, and failing to inform Plaintiffs of the use and disclosure of Plaintiffs' Confidential Information by Frankel, Jones, and others.

149.     As a direct and proximate result of Jarvis's and Jarvis Law Group's breaches of their fiduciary duties, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, as well as irreparable harm.

150.     Jarvis's, Jarvis Law Group's, Gribben's, and Gribben & Associates' misconduct was not in good faith, reasonable or prudent, and was in reckless disregard of Plaintiffs' rights, or was an intentional and wanton violation of Plaintiffs' rights.

**COUNT VI**
**(Breach of Fiduciary Duty)**
**(Plaintiffs against Gribben and Gribben & Associates)**

151.     Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

152.     By virtue of their roles as consultants and legal counsel to Plaintiffs, Plaintiffs held Gribben and Gribben & Associates in a position of trust and confidence and they owed fiduciary duties to Plaintiffs, including a duty of confidentiality, a duty of loyalty, a duty to act in Plaintiffs'

best interests, and an obligation to act in good faith in all matters related to their work with Plaintiffs.

153.    As set forth above, Gribben and Gribben & Associates breached their fiduciary duties and advanced their own interests to the detriment of Plaintiffs by misappropriating and failing to protect Plaintiffs' Confidential Information, conspiring with each of their Co-Defendants and/or Frankel to use the  Confidential Information misappropriated from Plaintiffs to sabotage and steal Plaintiffs' business, and failing to inform Plaintiffs of the use and disclosure of Plaintiffs' Confidential Information by Frankel, Jones, and others.

154.    As a direct and proximate result of Gribben's and Gribben & Associates' breaches of their fiduciary duties, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, as well as irreparable harm.

155.    Gribben's and Gribben & Associates' misconduct was not in good faith, reasonable or prudent, and was in reckless disregard of Plaintiffs' rights, or was an intentional and wanton violation of Plaintiffs' rights.

**<u>COUNT VII</u>**
**(Aiding and Abetting Breach of Fiduciary Duties)**
**(Plaintiffs against Vision and Rothman)**

156.    Plaintiffs reallege and incorporate paragraphs 1 through 155 as though fully set forth herein.

157.    When Jones, Jarvis, Jarvis Law Group, and Frankel engaged in the misconduct described above, Vision and Rothman knew or were generally aware that Jones, Jarvis, Jarvis Law Group, and Frankel were breaching fiduciary duties owed to Plaintiffs, and knew or were generally aware of their roles as part of the overall illegal or tortious activities that occurred with respect to Plaintiffs.

158.    Vision and Rothman provided knowing and substantial assistance to Jones, Jarvis, Jarvis Law Group, and Frankel in their breaches of their fiduciary duties owed to Plaintiffs.

159.    By aiding and abetting Jones's, Jarvis's, Jarvis Law Group's, and Frankel's breaches of their fiduciary duties owed to Plaintiffs, Vision and Rothman are jointly and severally liable for the damages Plaintiffs have suffered and will continue to suffer as a direct and proximate result of Jones's, Jarvis's, Jarvis Law Group's, and Frankel's breaches of their fiduciary duties.

### COUNT VIII
### (Aiding and Abetting Breach Fiduciary Duties)
### (Plaintiffs against Atlas, Schiable, Koonce and Koonce Securities)

160.    Plaintiffs reallege and incorporate paragraphs 1 through 155 as though fully set forth herein.

161.    When Frankel, Jones, Jarvis, Jarvis Law Group, Gribben, and Gribben & Associates engaged in the misconduct described above, Atlas, Schiable, Koonce, and Koonce Securities, knew or were generally aware that Frankel, Jones, Jarvis, Jarvis Law Group, Gribben, and Gribben & Associates were breaching fiduciary duties owed to Plaintiffs, and knew or were generally aware of their roles as part of the overall illegal or tortious activities that occurred with respect to Plaintiffs.

162.    Atlas, Schiable, Koonce, and Koonce Securities provided knowing and substantial assistance to Frankel, Jones, Jarvis, Jarvis Law Group, Gribben, and Gribben & Associates in their breaches of their fiduciary duties owed to Plaintiffs.

163.    By aiding and abetting Frankel's, Jones's, Jarvis's, Jarvis Law Group's, Gribben's and Gribben & Associates' breaches of their fiduciary duties owed to Plaintiffs, Atlas, Schiable, Koonce, and Koonce Securities are jointly and severally liable for the damages Plaintiffs have

suffered and will continue to suffer as a direct and proximate result of Frankel's, Jones's, Jarvis's, Jarvis Law Group's, Gribben's, and Gribben & Associates' breaches of their fiduciary duties.

## COUNT IX
### (Tortious Interference)
### (Plaintiffs against All Defendants)

164.    Plaintiffs reallege and incorporate paragraphs 1 through 155 as though fully set forth herein.

165.    Defendants had knowledge of Plaintiffs' advantageous business relationships with the customers and clients included within Alpine's Customer Information and Scottsdale's Client Information.

166.    Defendants, Rothman, Vision, Schiable, Atlas, Koonce, and Koonce Securities, also had knowledge of Frankel's, Jones's, Jarvis's, Jarvis Law Group's, Gribben's, and Gribben & Associates's contracts with Plaintiffs.

167.    Defendants intentionally, unjustifiably, and maliciously interfered with Plaintiffs' business relationships with their customers and clients and contractual relationships with Frankel, Jones, Jarvis, Jarvis Law Group, Gribben, and Gribben & Associates by misappropriating Plaintiffs' Confidential Information and utilizing it to poach the Plaintiffs' clients and divert business away from the Plaintiffs to their own benefit.

168.    As a direct and proximate result of the Defendants' tortious conduct, Plaintiffs have suffered damages in an amount to be determined at trial, as well as irreparable harm.

## COUNT X
### (Conspiracy)
### (Plaintiffs against All Defendants)

169.    Plaintiffs reallege and incorporate paragraphs 1 through 168 as though fully set forth herein.

170.     Defendants knowingly agreed to and participated in a common unlawful scheme to further and assist Jones's, Frankel's, Jarvis's, and Gribben's breaches of their contractual and fiduciary duties, misappropriate and use Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, and tortuously interfere with Plaintiffs' advantageous business relationships with their customers and clients and contractual agreements with Frankel, Jones, Jarvis, Jarvis Law Group, Gribben, and Gribben & Associates.

171.     The numerous acts alleged herein were undertaken by the Defendants in furtherance of their scheme and conspiracy.

172.     As a direct and proximate result of the Defendants' tortious conduct, Plaintiffs have suffered damages in an amount to be determined at trial, as well as irreparable harm.

## COUNT XI
### (Statutory Deceptive and Unfair Trade Practices)
### (Plaintiffs Against All Defendants)

173.     Plaintiffs reallege and incorporate paragraphs 1 through 172 as though fully set forth herein.

174.     Defendants have at all relevant times herein been engaged in a trade or commerce.

175.     Defendants engaged in one or more deceptive, unfair, unconscionable, immoral, unethical, and/or unscrupulous acts or practices, including: (a) conspiring to misappropriate the Plaintiffs' Confidential Information; (b) misappropriating Plaintiffs' Confidential Information; (c) intentionally and maliciously using Plaintiffs' unlawfully misappropriated Confidential Information to poach the Plaintiffs' clients and tortuously interfere with the Plaintiffs' business relationships and economic expectancies.

176.    Defendants' conduct alleged herein violates public policy, is immoral, unethical, and/or unscrupulous, and is substantially injurious to consumers, competitors or businesspeople, including Plaintiffs.

177.    Defendants engaged in the acts alleged herein to unfairly compete with Plaintiffs, and are competitors of Plaintiffs for a common pool of customers and clients.

178.    As a direct and proximate result of the aforesaid conduct, Plaintiffs have suffered substantial injury, ascertainable loss, and actual damages, as well as irreparable harm.

179.    Accordingly, pursuant to Florida's and/or Connecticut's Deceptive and Unfair Trade Practices Act, Plaintiffs are entitled to recover damages, injunctive relief, and/or declaratory relief.

## COUNT XII
### (Civil Theft)
### (Plaintiffs against All Defendants)

180.    Plaintiffs reallege and incorporate paragraphs 1 through 121 as though fully set forth herein.

181.    Defendants stole Plaintiffs' Confidential Information, Alpine's Customer Information and Scottsdale's Customer Information in order to use such property for their own benefit and to the detriment of the Plaintiffs.

182.    Defendants, Rothman, Vision, Schiable, Atlas, Koonce, and Koonce Securities, knowingly received and concealed Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information, knowing that such property had been stolen by Jones, Jarvis, Gribben, and/or Frankel.

183.    Defendants committed the foregoing actions with the intent to deprive the Plaintiffs of their property.

184.   As a direct and proximate result of the Defendants' conduct, the Plaintiffs have suffered damages in an amount to be determined at trial, as well as irreparable harm.

## COUNT XIII
### (Common Law Unfair Competition)
### (Plaintiffs against All Defendants)

185.   Plaintiffs reallege and incorporate paragraphs 1 through 172 as though fully set forth herein.

186.   Defendants knowingly and intentionally engaged in unfair and unlawful conduct.

187.   Defendants engaged in this unfair and unlawful conduct to obtain an unfair competitive advantage over Plaintiffs.

188.   As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial, specifically including lost profits and/or disgorgement of Defendants' profits, as well as irreparable harm.

## COUNT XIV
### (Injunctive Relief)
### (Plaintiffs against All Defendants)

189.   Plaintiffs reallege and incorporate paragraphs 1 through 188 as though fully set forth herein.

190.   As a direct and proximate result of Defendants' unlawful, tortious, unfair, and deceptive misconduct alleged above, Plaintiffs have suffered and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

191.   Plaintiffs have the clear legal right to the entry of an injunction prohibiting Defendants' unlawful, tortious, unfair, and deceptive misconduct.

192.   The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful, tortious, unfair, and deceptive misconduct.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS request relief as follows:

1.      Temporary and/or permanent injunctive relief prohibiting Defendants and all persons acting in concert or coordination with them from retaining or using Plaintiffs' Confidential Information, Alpine's Customer Information, and Scottsdale's Client Information;

2.      An award of general, actual, consequential, and special damages, in an amount to be proven at trial;

3.      A declaration that Defendants engaged in deceptive and unfair trade practices;

4.      An award of attorneys' fees;

5.      An award of all costs of suit incurred; and

6.      Such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on issues so triable.

Dated:  November 6, 2020.

/s/ Kenneth G. Turkel
Kenneth G. Turkel
Florida Bar No. 867233
E-mail:  kturkel@bajocuva.com
Shane B. Vogt
Florida Bar No. 257620
E-mail:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193
Attorneys for Plaintiffs

*Alpine Securities Corporation, et al. v. Randall Jones, et al.*
Case No.  [NEW]

# EXHIBIT A

**to Complaint & Demand for Jury Trial**

CONFIDENTIAL

Kandall Jones

# ALPINE SECURITIES CORPORATION
## MEMORANDUM TO EMPLOYEES

**FROM:**     Robert L. Tew, President
              Nathan D. Simmons, General Counsel

**DATE:**     April 16, 2015

**SUBJECT:**  Employee Agreement on Confidentiality and Use of Company Property

    Attached is an Employee Nondisclosure & Computer Use Agreement. Alpine is requiring that each of its employees sign this agreement to assure that everyone understands the need for confidentiality, particularly in the securities business, and that Alpine's information equipment and systems are for business use.

    We believe our employees have always understood the need that Alpine's proprietary information (such as trade secrets) be kept confidential. This is a fact of life for any business that operates in a competitive environment. However, the need for confidentiality is also especially important in a regulated industry, such as ours, because some information must be kept confidential as a matter of law.

    Please note in that in Section 1, "Company's Confidential Information," that not all types of information you might learn here is confidential – for instance something that is publicly known anyway. Section 1 also provides additional information on the specific types of information that must be kept confidential, such as technical specifications and business plans.

    Also, as set forth in Section 5, "Use of Computers and Company Property; Access to Information Systems," it is important that Alpine's employees understand that computers and other property supplied by the company, as well as access to Alpine's information technology systems, is for business – not personal – use. Also, Alpine requires that its employees return company-owned property upon request or at the end of their employment with Alpine.

    If you have any questions, please do not hesitate to speak to either of us or a member of your management team.

## ALPINE SECURITIES CORPORATION
## EMPLOYEE NONDISCLOSURE & USE OF COMPANY PROPERTY AGREEMENT

This Employee Nondisclosure & Use of Company Property Agreement (this "Agreement") is entered into by Alpine Securities Corporation, a Utah corporation ("Company"), and (print name) _Randall Jones_ ("Employee"), as of the date set forth below.

In consideration of the commencement or continuation of Employee's employment by the Company, Employee and Company agree as follows:

### 1.   Company's Confidential Information

In the performance of Employee's job duties with Company, Employee may have access to or possess Company's Confidential Information. "Confidential Information" means material information, in whatever format or media it may be prepared, stored or retained (including, without limitation, paper format or electronically), that is commercially valuable to Company with respect to its business, is not generally known or readily ascertainable in the business of the Company, as a general matter is protectable as a "trade secret" under the law of the respective jurisdictions in which the Company conducts its business.

However, Confidential Information shall not include such information that:

(i)      was or is known to or in Employee's possession, but not in connection with Employee's employment by the Company, as to which Employee is not legally obligated to keep such information confidential;

(ii)      is or becomes available as a matter of public knowledge other than as a breach, by Employee of Employee's legal obligation to maintain the confidentiality of such information; or

(iii)      is or becomes lawfully available to Employee from a person not legally obligated to maintain the confidentiality of such information;

(iv)      as to which Employee becomes legally required to disclose such information;

Subject to the forgoing provisions of this Section 1, this includes, but is not limited to:

(a)      technical information concerning Company's products and services, including product know-how, proprietary designs and documentation, software code, and results of research and studies, projects and product development along with technical memoranda and correspondence;

(b)      information concerning Company's business and operations, including financial and accounting information, sales records, business plans, markets and marketing methods,

customer lists and customer information, suppliers and supplier information and marketing plans, methods and strategies;

(c)     information concerning Company's employees in connection with their employment by Company;

(d)     information submitted by Company's customers, suppliers, employees, consultants or co-venture partners for study, evaluation or use.

**2.   Confidential Information of Others**

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secrets of others as to which Employee is legally obligated to maintain such confidentiality.

**3.   Return of Materials**

When Employee's employment with Company ends, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials which consist of and contain Confidential Information in whatever format such originals and copies are stored, maintained or used.  Employee will also return to Company all personal property belonging to Company.

**4.   Confidentiality Obligation Survives Employment**

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains Confidential Information legally protectable hereunder.

**5.   Use of Computers and Company Property; Access to Information Systems**

As part of Employee's duties, Employee will have access to Company's information technology systems certain computer, data processing, and electronic communication equipment, which includes Company's internal and proprietary external network systems, used for conduct of Company's business.  All such electronic systems and equipment will be referred to as "ECS." As a condition of employment, Employee agrees to the following restrictions on the access and use of ECS:

(a)     Access and use of ECS is intended for, and limited to purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities that may be approved by Company.

(b)     ECS information or messages, as created, sent, received or stored using Company's ECS in connection with Company's business are the property of Company, and accordingly, are subject to Company's right to monitor and store information in or relating to ECS.

(c)     With respect to ECS, Employee is the sole person authorized to use sign-in, screen or account names and passwords, which are made available to, or used by Employee, in

connection with Employee's employment by Company, and Employee will not share said information except with the consent of the Company; provided, however, that other persons who are legally and properly authorized may from time-to-time have access to, and use such information.

(d)  Prohibited actions by Employee using ECS, include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6) attaching unauthorized devices to Company's computer network; and (7) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

(e)  Notwithstanding the foregoing provisions of this Section 5, it is acknowledged that there are or may be certain, limited circumstances under which these provisions legally or properly may be, or required to be, lifted or superseded, such as, and without limitation, in connection with compliance with a court order, a lawful internal investigation, or actions by law enforcement officials.

## 6. General Provisions

(a)  <u>Relationships</u>: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

(b)  <u>Severability</u>: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(c)  <u>Integration</u>: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(d)  <u>Waiver</u>: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(e)  <u>Injunctive Relief</u>: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(f)  <u>Governing Law</u>. This Agreement shall be governed in accordance with the laws of the State of Utah.

(j)     <u>Successors & Assigns</u>. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

**EMPLOYER:**                                                    **EMPLOYEE:**
**ALPINE SECURITIES CORPORATION**

By: _____                      _____
        (SIGNATURE)                                                (SIGNATURE)

Name                                                            Print
and Title ___Robert Tew, President_____       Name _____

Date of this Agreement: ___April 16th, 2015__

*Alpine Securities Corporation, et al. v. Randall Jones, et al.*
Case No.  [NEW]

# EXHIBIT B

### *to Complaint & Demand for Jury Trial*



# SCOTTSDALE CAPITAL ADVISORS

7170 E. McDonald Road, Suite 6, Scottsdale, Arizona  Tel. 480-603-4900  Fax. 480-603-4901

### NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

This NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT (the "Agreement") is made as of __June 22nd__, 2015, by __Christopher Lee Frankel__ (the "Recipient") and SCOTTSDALE CAPITAL ADVISORS CORPORATION, an Arizona corporation, Alpine Securities Corporation an Utah corporation, Cayman Securities Clearing and Trading LTD a Cayman Limited Company and any associated company of the Hurry Family Revocable Trust (the "Discloser")

### RECITALS:

**WHEREAS**, Recipient and Disclosure have entered into discussions to form a business or employment relationship in connection with the Disclosure's business; and

**WHEREAS**, in connection with such discussions, the Discloser will communicate to the Recipient and grant the Recipient access to Confidential Information (as defined below) pertaining to Discloser's business, which Confidential Information the Recipient recognizes to be the sole property of the Discloser and highly confidential in nature and the transmission of which is granted in consideration of the Recipient's acceptance to sign this Agreement.

**NOW, THEREFORE, THE PARTIES HERETO HEREBY AGREE AS FOLLOWS**

1.      CONFIDENTIAL INFORMATION DEFINITION

(a)     For purposes of this Agreement, "**Confidential Information**" means any data or information that is proprietary to the Discloser and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services; (iii) customer lists and account information; (iv) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology or method; (v) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (vi) any other information that should reasonably be recognized as confidential information of the Discloser. Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be designated Confidential Information. The Recipient acknowledges that the Confidential Information is proprietary to the Discloser, has been developed and obtained through great efforts by the Discloser and that Discloser regards all of its Confidential Information as trade secrets under the Arizona Trade Secrets Act, as amended (A.R.S. §44-401 set seq.)

(b)     Notwithstanding anything in the foregoing to the contrary, Confidential Information shall not include information which: (i) was known by the Recipient prior to receiving the Confidential Information from the Discloser; (b) becomes rightfully known to the Recipient from a third-party source not known (after diligent inquiry) by the Recipient to be under an obligation to Discloser to maintain confidentiality; (c) is or becomes publicly available through no fault of or failure to act by the Recipient in breach of this Agreement; (d) is required to be disclosed in a judicial or administrative proceeding, or is otherwise requested or required to be disclosed by law or regulation, although the requirements of paragraph 4 hereof shall apply prior to any disclosure being made; and (e) is or has been independently developed by employees, consultants or agents of the Recipient without violation of the terms of this Agreement or reference or access to any Confidential Information.

2       NON-DISCLOSURE AND NON-USE OF CONFIDENTIAL INFORMATION

(a)     With respect to Confidential Information obtained by Recipient, Recipient (i) will not, and will not permit its officers, directors, employees, agents, independent contractors, advisors and affiliates (the "Representatives") to disclose, publish or disseminate Confidential Information to anyone other than its employees and agents on a need-to-know basis; (ii) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth in this Agreement; and require such Representatives to keep the Confidential Information confidential; (iii) shall keep all Confidential Information strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information, and (iv) not disclose any Confidential Information received



HURRY0001

CONFIDENTIALITY AGREEMENT

by it to any third parties (except as otherwise provided for herein).

(b)     The Recipient agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of an authorized representative of the Discloser. No other right or license, whether expressed or implied, in the Confidential Information is granted to the Recipient hereunder. Title to the Confidential Information will remain solely in the Discloser. All use of Confidential Information by the Recipient shall be for the benefit of the Discloser and any modifications and improvements thereof by the Recipient shall be the sole property of the Discloser.

3.     NO WARRANTY. All information is provided "AS IS" and without any warranty, whether express or implied, as to its accuracy or completeness.

4.     DISCLOSURE BY LAW. If Recipient or its Representatives is requested or required by any law, court or governmental order to disclose any Confidential Information, Recipient agrees to provide Discloser with prompt written notice of each such request, to the extent practical, so that Discloser may seek an appropriate protective order or waive compliance by the Recipient with the provisions of this Agreement or both. If, absent the entry of a protective order or the receipt of a waiver under this Agreement, the Recipient or its Representatives is legally compelled or required to disclose such Confidential Information, Recipient may disclose such information to the persons and to the extent required without liability under this Agreement.

5.     RETURN OF DOCUMENTS. Within ten (10) business days of receipt of the Discloser's written request, the Recipient will return to the Discloser all documents, records and copies thereof containing Confidential Information. For purposes of this section, the term "documents" includes all information fixed in any tangible medium of expression, in whatever form or format.

6.     EQUITABLE RELIEF. The Recipient hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to the Discloser. Accordingly, the Recipient agrees that the Discloser will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.

7.     NOTICE OF BREACH. Recipient shall notify the Discloser immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Recipient or its Representatives, or any other breach of this Agreement by Recipient or its Representatives and will cooperate with efforts by the Discloser to help the Discloser regain possession of Confidential Information and prevent its further unauthorized use.

8.     ENTIRE AGREEMENT AND GOVERNING LAW. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions, representations and agreements with respect to same. No modification to this Agreement shall be binding unless in writing and signed by both parties. This Agreement shall be governed and construed in accordance with the laws applicable in the State of Arizona.

9.     EXECUTION. This agreement may be executed by facsimile or other electronic signature. In the event that any signature is delivered by facsimile transmission or by email delivery of an electronic format data file (e.g., pdf, .tiff, etc.), such signature shall create a valid and binding obligation of the party executing with the same force and effect as if such facsimile or electronic data file signature page were an original thereof.

RECIPIENT

By: C Fahl
Name: Christopher Frankel
Title: N/a

ADDRESS: ████████
Tampa  FL 33629
PHONE: ████████
EMAIL: ████████

HURRY0002

*Alpine Securities Corporation, et al. v. Randall Jones, et al.*
Case No.  [NEW]

# EXHIBIT C

*to Complaint & Demand for Jury Trial*

## EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by *Alpine Securities / Scottsdale Capital* and its subsidiaries and affiliates ("Company") and *Christopher L Frankel* ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

### 1. Company's Confidential Information

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" shall mean all written or oral information of a proprietary, intellectual or similar nature relating to Company's business, projects, operations, activities or affairs whether of a technical or financial nature or otherwise. Confidential Information includes, but is not limited to:

(a) technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b) information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c) information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d) information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

### 2. Nondisclosure of Trade Secrets

Company's Confidential Information are 'trade secrets' as defined in Arizona Revised Statutes, Sections 44-401 et seq. Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a) was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b) is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c) is or becomes lawfully available to Employee from a source other than Company.

### 3. Confidential Information of Others

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

### 4. Return of Materials

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(EE NDA:01 2013)

*CF*

HJRFi/0003

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

**5.   Confidentiality Obligation Survives Employment**

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

**6.   Computer Access and Use**

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications.  As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS. Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone.  If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s).  If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6)sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

**7.   General Provisions**

(a) Affiliates and Subsidiaries. For purposes of sections 1, 2, 3, 4, and 5 of this Agreement, the term "Company" shall include all affiliates and subsidiaries of Company, all directors, shareholders, and officers of Company, and all directors, shareholders and officers of Company's affiliates and subsidiaries.

(b) Relationships: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

*CF*

(c) Severability: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(d) Integration: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(e) Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(f) Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(g) Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(h) Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(i) Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(j) Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(k) Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

## 8. Signatures

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

Employee:

_____   (Signature)

Chris Frenkel (Typed or Printed Name)

Date: 07/01/2015

HURRY0005

*Alpine Securities Corporation, et al. v. Randall Jones, et al.*
Case No.  [NEW]

# EXHIBIT D

### *to Complaint & Demand for Jury Trial*

# DAVID H. JARVIS
# ALPINE SECURITIES CORPORATION

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "**Agreement**") is entered into as of March 15, 2017 (the "**Effective Date**"), by and between **Alpine Securities Corporation**, a Utah corporation (the "**Company**"), and **David H. Jarvis**, an individual (the "**Consultant**"). Any or each of the foregoing parties shall be referred to as "**Parties**" or a "**Party**".

**WHEREAS,** the Consultant has substantial experience in various legal, compliance and operational matters in connection with registered broker-dealers; and

**WHEREAS,** the Company desires to retain the Consultant perform consulting and legal services to Alpine and its affiliate, Scottsdale Capital Advisors (the "**Services**"), as further provided below; and

**WHEREAS,** it is planned that the Consultant will perform the Services onsite at the Company's premises in Salt Lake City and other locations, including working remotely as the Parties may mutually agree; and

**WHEREAS,** the Parties desire that the provisions of this Agreement shall memorialize the mutual promises, agreements and performances with respect to the engagement of the Consultant by the Company as provided herein;

**NOW THEREFORE:**

1.     TERM: The term of this Agreement shall begin on the date first above written and shall terminate, as provided in Section 5 below, with the intent that the Consultant will perform the following services as requested by the Company:

(a) Review, respond to and advise executive management regarding regulatory inquiries and investigations;

(b) Analysis, development and modifications of processes and procedures regarding low-priced securities business;

(c) Review of and assistance with AML processes and procedures;

(d) Assistance with compliance processes and procedures;

(e) Assistance with the broker-dealer's 211 processes and procedures;

(f) Assistance with staff training when and where appropriate; and

(g) Other matters as directed by the CEO of Company.

It is also contemplated hereby that Consultant may perform similar services for certain business entities that share common ownership with the Company.

2.     CONSULTANT'S DUTIES: The Consultant will personally perform all duties under this agreement in connection with the Services, as may be necessary or warranted. The Consultant shall report to the CEO of Company or other person as designated by the CEO. t is contemplated hereby that consultant will provide services from the offices of the Jarvis Law

Group PLLC, from the offices of the Company and from the offices of Scottsdale Capital Advisors located in Scottsdale, Arizona.

3.  **COMPENSATION TO CONSULTANT:**  The Company agrees to pay the Consultant consulting fees of $12,000.00 per month, payable in accordance with the Company's standard payroll practices.  Consultant shall provide a W-9 to the Company upon the execution of this Agreement.

4.  **EXPENSES:** The Company will reimburse the Consultant for any normal and customary travel and out-of-pocket expenses incurred by the Consultant in the performance of the Consultant's duties under this Agreement, including without limitation expenses for airline flights, hotels, meals, and other out-of-pocket expenses incident to the Consultant's performance of this Agreement. . Consultant shall obtain the prior approval of Company for any such expense that exceeds $2,500 for any monthly period.

5.  **TERMINATION:** This Agreement shall terminate on June 30, 2017, unless mutually extended or terminated early. This Agreement may be terminated by either party, at any time and for any reason, upon one (1) week advance written notice to the other party.

6.  **RELATIONSHIP OF PARTIES:**  The Consultant acknowledges that the Consultant is an independent contractor and that the Consultant is fully responsible for the Consultant's own federal, state and local taxes and that, as an independent contractor, neither the Consultant nor any persons assisting the Consultant (except for any employees of the Company who may provide assistance to the Consultant) is eligible to participate in any employee benefit program offered by Company to its employees.  The Consultant further understands and agrees that the Consultant is not covered under the Company's worker's compensation insurance or state unemployment insurance coverages.  The Consultant expressly represents that the Consultant is an independent contractor under the laws of the United States and the common law and acknowledges that the Company is relying upon this representation.  It is understood that the Consultant maintains an independent business and, subject to the provisions of this Agreement, may work on other projects aside from the Services.  However, the Consultant will spend a majority of Consultant's time to ensure the timely and proper completion of the Services.  Except as may be explicitly agreed in writing by the Parties to this Agreement, the Company and the Consultant acknowledge and agree that this Agreement does not constitute or appoint the Consultant as an agent, representative or partner of the Company authorized to act for or bind the Company or any affiliate of the Company for any purpose whatsoever. Nothing herein in this section shall limit Consultant's fiduciary responsibilities to Company to avoid and disclose potential conflicts under State ethical rules and laws applicable to attorneys.

7.  **CONFIDENTIAL INFORMATION; DUTY TO MAINTAIN CONFIDENTIALITY:**  In the performance of the Services, the Consultant will have access to or possess Confidential Information of Company and it affiliates.  As a material term of this Agreement, the Consultant agrees not to disclose, and shall maintain in strictest confidence, such information without Company's prior written consent except as otherwise specifically provided herein or in a written agreement with the Company.  Reference to confidential information herein shall also include confidential information of Scottsdale Capital Advisors, unless the context requires otherwise. The Company and the Consultant acknowledge that, in the performance of the Services, as may be reasonably necessary, the Consultant may consult with or work with other persons, including attorneys, accountants and other professional persons or service providers not employed by the

Company; provided, however, that the Consultant shall be reasonably assured that any such persons recognize and are bound by these obligations to maintain confidentiality.

(a)   **Definition of Confidential Information.** "**Confidential Information**" means information, in whatever format or media it may be prepared, stored or retained (including, without limitation, paper format or electronically), that is commercially valuable to the Company, including its affiliates, with respect to its business, is not generally known or readily ascertainable to third parties in connection with the business of the Company, including without limitation:

(i)   information concerning Company's business and operations, including financial and accounting information, sales records, business plans, markets and marketing methods, customer lists and customer information, suppliers and supplier information and marketing plans, methods and strategies;

(ii)   technical information concerning Company's products and services, including product know-how, proprietary designs and documentation, and results of research and studies, projects and product development along with technical memoranda and correspondence;

(iii)   information concerning Company's employees in connection with their employment by Company;

(iv)   information submitted by Company's customers, suppliers, employees, consultants or co-venture partners for study, evaluation or use.

(v)   information that is protectable as a "trade secret" under the law of the respective jurisdictions in which the Company conducts its business;

(vi)   other data or information which is proprietary to the Company, or has been developed by and at the expense of the Company, and is not generally known to the public, whether in tangible or intangible form;

(vii)   any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of the Company or its affiliates;

(viii)   customer lists and account information;

(ix)   any scientific or technical information, invention, design, process, procedure, technology or technology-based method;

(x)   any concepts, data, know-how, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets;

(xi)   any legally confidential or privileged communications or information; and

(xii)   any other information that should reasonably be recognized as confidential information of the Company, whether or not novel, unique, patentable, copyrightable;.

(b)     **Exclusions from Definition.**  Notwithstanding the foregoing provisions, Confidential Information shall not include: information which:

(i)      was known by the Consultant prior to receiving the Confidential Information from the Company, and would not involve violation of any duty of confidentiality of the Consultant;;

(ii)     becomes rightfully known to the Consultant from a third-party source that is not subject to maintain the confidentiality of the information;

(iii)    is or becomes publicly available through no fault of or failure to act by the Consultant in breach of this Agreement;

(iv)     is required to be disclosed pursuant to a judicial or administrative proceeding or order, or under applicable law or regulation; or

(v)      is or has been independently developed by employees, consultants or agents of the Consultant without violation of the terms of this Agreement or reference or access to any Confidential Information;

(c)     **Duty to Give Notice.**  If the Consultant receives any order or other directive is required to be disclosed pursuant to a judicial or administrative proceeding or order, or under applicable law or regulation, the Consultant shall promptly give notice thereof to the Company, in order for the Company to have such opportunity as may be available or reasonable to contest or limit the scope of such order or other directive;

(d).    **Permitted Uses of Confidential Information.**  The Consultant agrees to use the Company's Confidential Information only in the performance of his Agreement, shall provide Confidential Information only to those persons who have a need to know in the performance of this Agreement, shall cause all other persons to whom any Confidential Information may need to be disclosed to agree to keep maintain the confidentiality of the Confidential Information, and shall promptly, upon request from the Company, return to the Company any and all media upon which Confidential Information may records or stored, whether in paper or electronic format, or otherwise cause any such electronically-stored Confidential Information to be completely and irretrievably deleted from any media or storage devices which remain in possession of the Consultant.

(e)     **Equitable Relief for Breach of Confidentiality Provisions Herein.**  The Company hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to the Company.  Accordingly, the Consultant agrees that the Company will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.  The provisions of this clause (e) shall not act to limit or otherwise diminish the any and all other rights, claims, remedies or causes of action that the Company may have under this Agreement or as otherwise provided by law.

(f)     **Survival of Confidentiality Provisions.**  The Consultant's obligation, and the obligation of all other persons so obligated, to maintain the confidentiality and security of Confidential Information shall remain in full force and effect during and after the termination of this Agreement.

8.     GOVERNING LAW:  The laws of the State of Utah shall govern this Agreement.

9.    ASSIGNMENT.  Inasmuch as this Agreement is primarily intended to be with respect to the provision of personal services by the Consultant, this Agreement shall not be assigned by the Consultant except with the prior written consent of the Company.\

10.    WAIVER.  The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

11.    NO ASSIGNMENT.  Neither this Agreement nor any right or obligation hereunder may be assigned by a Party without the consent of any and all other Parties to this Agreement.

12.    COUNTERPARTS; SIGNATURES.  This Agreement may be executed in any number of counterparts, each of which together, with the signature of each Party hereto, shall constitute one and the same agreement.  A signature received by facsimile or electronically shall be deemed to have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

| ALPINE SECURITIES CORPORATION | CONSULTANT |
|---|---|
| By:  Christopher L. Frankel<br>       Chief Executive Officer | David H. Jarvis |
| 39 Exchange Place<br>Salt Lake City, Utah 84111 | Jarvis Law Group PLLC<br>7031 Orchard Lake Road, Suite 206<br>West Bloomfield, MI  48322 |
| Telephone: ▮▮▮▮▮▮ | Telephone: ▮▮▮▮▮▮<br>Cellular: ▮▮▮▮▮▮ |
| E-mail: ▮▮▮▮▮▮ | E-mail: ▮▮▮▮▮▮ |

*Alpine Securities Corporation, et al. v. Randall Jones, et al.*
Case No.  [NEW]

# EXHIBIT E

**to Complaint & Demand for Jury Trial**

STEVEN M. GRIBBEN
ALPINE SECURITIES CORPORATION

CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "**Agreement**") is entered into this _12th_ day of July 2017 (the "**Effective Date**"), by and between **Alpine Securities Corporation**, a Utah corporation (the "**Company**"), and **Gribben & Associates, Inc.**, a California corporation (the "**Consultant**").  Any or each of the foregoing parties shall be referred to as "**Parties**" or a "**Party**".

**WHEREAS,** the Consultant has substantial experience in various legal and operational matters in connection with registered broker-dealers, investment banking, securities offerings and transactional matters; and

**WHEREAS,** the Company desires to retain the Consultant to perform consulting and legal services with respect to general securities and regulatory matters, and the development of the Company's investment banking platform (the "**Services**"), as further provided below; and

**WHEREAS,** it is planned that the Consultant will perform the Services primarily remotely, but from time to time onsite at the Company's premises in Salt Lake City, Utah; and

**WHEREAS,** the Parties desire that the provisions of this Agreement shall memorialize the mutual promises, agreements and performances with respect to the engagement of the Consultant by the Company as provided herein;

NOW THEREFORE:

1.    **TERM:** The term of this Agreement shall begin on the date first above written and shall terminate, as provided in Section 5 below (the "Term"), with the intent that the Consultant will perform the following services as requested by the Company:

(a) Assist on a limited basis with the review of prospective and ongoing deposits of securities and securities transactions of the Company's customers;

(b) Spearhead the development of the policies and procedures for the Company's placement agent and investment banking business; and,

(c) Assist in the performance of due diligence on various business lines associated with the Company's anticipated placement agent and investment banking business.

2.    **CONSULTANT'S DUTIES:**  The Consultant will personally perform all duties under this agreement in connection with the Services, as may be necessary or warranted.  The Parties anticipate that Consultant's services will be performed primarily remotely.  However, Consultant shall make himself available as needed to perform services onsite at the Company's offices in Salt Lake City or at other designated locations.  The Consultant and the Company shall in good faith discuss and determine a reasonable schedule regarding such onsite work, if needed, including when and at which location such onsite Services shall be performed.

3.    **COMPENSATION TO CONSULTANT:**  The Company agrees to pay the Consultant consulting fees of $12,000 per month, payable in accordance with the Company's standard

payroll practices. Consultant shall provide a W-9 to the Company upon the execution of this Agreement.

4.     EXPENSES: The Company will reimburse the Consultant for any normal and customary travel and out-of-pocket expenses incurred by the Consultant in the performance of the Consultant's duties under this Agreement, including without limitation expenses for airline flights, hotels, meals, and other out-of-pocket expenses incident to the Consultant's performance of this Agreement. Consultant shall obtain the prior approval of Company for any such expense that exceeds $2,500 for any monthly period.

5.     TERMINATION: This Agreement is entered into in contemplation of the Consultant's performance of the Services, compensation as provided in Section 3 above, and reimbursements as provided in Section 4 above, and shall continue for 30 days and successive 30-day terms until terminated upon at least one week's advance written notice by either party. Notwithstanding the foregoing provisions of this Section 5, Consultant agrees to remain licensed as an attorney during the Term.

6.     RELATIONSHIP OF PARTIES: The Consultant acknowledges that the Consultant is an independent contractor and that the Consultant is fully responsible for the Consultant's own federal, state and local taxes and that, as an independent contractor, neither the Consultant nor any persons assisting the Consultant (except for any employees of the Company who may provide assistance to the Consultant) is eligible to participate in any employee benefit program offered by Company to its employees.  The Consultant further understands and agrees that the Consultant is not covered under the Company's worker's compensation insurance or state unemployment insurance coverages. The Consultant expressly represents that the Consultant is an independent contractor under the laws of the United States and the common law and acknowledges that the Company is relying upon this representation.  It is understood that the Consultant maintains an independent business and, subject to the provisions of this Agreement, may work on other projects aside from the Services.  However, the Consultant will spend a majority of the Consultant's time to ensure the timely and proper completion of the Services. Except as may be explicitly agreed in writing by the Parties to this Agreement, the Company and the Consultant acknowledge and agree that this Agreement does not constitute or appoint the Consultant as an agent, representative or partner of the Company authorized to act for or bind the Company or any affiliate of the Company for any purpose whatsoever. Nothing herein in this section shall limit Consultant's fiduciary responsibilities to Company to avoid and disclose potential conflicts under State ethical rules and laws applicable to attorneys.

7.     CONFIDENTIAL INFORMATION; DUTY TO MAINTAIN CONFIDENTIALITY:  In the performance of the Services, the Consultant will have access to or possess the Confidential Information of the Company and its affiliates.  As a material term of this Agreement, the Consultant agrees not to disclose, and shall maintain in strictest confidence, such information without Company's prior written consent except as otherwise specifically provided herein or in a written agreement with the Company.  Reference to confidential information herein shall also include confidential information of Scottsdale Capital Advisors, unless the context requires otherwise.  The Company and the Consultant acknowledge that, in the performance of the Services, as may be reasonably necessary, the Consultant may consult with or work with other persons, including attorneys, accountants and other professional persons or service providers not employed by the Company; provided, however, that the Consultant shall be reasonably assured that any such persons recognize and are bound by these obligations to maintain confidentiality.

(a)      **Definition of Confidential Information. "Confidential Information"**
means information, in whatever format or media it may be prepared, stored or retained
(including, without limitation, paper format or electronically), that is commercially valuable to
the Company, including its affiliates, with respect to its business, is not generally known or
readily ascertainable to third parties in connection with the business of the Company, including
without limitation:

    (i)      information concerning Company's business and operations,
including financial and accounting information, sales records, business plans, markets and
marketing methods, customer lists and customer information, suppliers and supplier
information and marketing plans, methods and strategies;

    (ii)      technical information concerning Company's products and services,
including product know-how, proprietary designs and documentation, and results of
research and studies, projects and product development along with technical memoranda
and correspondence;

    (iii)      information concerning Company's employees in connection with
their employment by Company;

    (iv)      information submitted by Company's customers, suppliers,
employees, consultants or co-venture partners for study, evaluation or use.

    (v)      information that is protectable as a "trade secret" under the law of
the respective jurisdictions in which the Company conducts its business;

    (vi)      other data or information which is proprietary to the Company, or
has been developed by and at the expense of the Company, and is not generally known to
the public, whether in tangible or intangible form;

    (vii)      any marketing strategies, plans, financial information, or
projections, operations, sales estimates, business plans and performance results relating to
the past, present or future business activities of the Company or its affiliates;

    (viii)      customer lists and account information;

    (ix)      any scientific or technical information, invention, design, process,
procedure, technology or technology-based method;

    (x)      any concepts, data, know-how, specifications, computer software,
source code, object code, flow charts, databases, inventions, information and trade
secrets;

    (xi)      any legally confidential or privileged communications or
information; and

    (xii)      any other information that should reasonably be recognized as
confidential information of the Company, whether or not novel, unique, patentable,
copyrightable;.

(b)      **Exclusions from Definition.** Notwithstanding the foregoing provisions,
Confidential Information shall not include: information which:

(i)      was known by the Consultant prior to receiving the Confidential Information from the Company, and would not involve violation of any duty of confidentiality of the Consultant;;

(ii)      becomes rightfully known to the Consultant from a third-party source that is not subject to maintain the confidentiality of the information;

(iii)      is or becomes publicly available through no fault of or failure to act by the Consultant in breach of this Agreement;

(iv)      is required to be disclosed pursuant to a judicial or administrative proceeding or order, or under applicable law or regulation; or

(v)      is or has been independently developed by employees, consultants or agents of the Consultant without violation of the terms of this Agreement or reference or access to any Confidential Information;

(c)      **Duty to Give Notice.** If the Consultant receives any order or other directive is required to be disclosed pursuant to a judicial or administrative proceeding or order, or under applicable law or regulation, the Consultant shall promptly give notice thereof to the Company, in order for the Company to have such opportunity as may be available or reasonable to contest or limit the scope of such order or other directive;

(d).      **Permitted Uses of Confidential Information.** The Consultant agrees to use the Company's Confidential Information only in the performance of his Agreement, shall provide Confidential Information only to those persons who have a need to know in the performance of this Agreement, shall cause all other persons to whom any Confidential Information may need to be disclosed to agree to keep maintain the confidentiality of the Confidential Information, and shall promptly, upon request from the Company, return to the Company any and all media upon which Confidential Information may records or stored, whether in paper or electronic format, or otherwise cause any such electronically-stored Confidential Information to be completely and irretrievably deleted from any media or storage devices which remain in possession of the Consultant.

(e)      **Equitable Relief for Breach of Confidentiality Provisions Herein.** The Company hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to the Company. Accordingly, the Consultant agrees that the Company will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have. The provisions of this clause (e) shall not act to limit or otherwise diminish the any and all other rights, claims, remedies or causes of action that the Company may have under this Agreement or as otherwise provided by law.

(f)      **Survival of Confidentiality Provisions.** The Consultant's obligation, and the obligation of all other persons so obligated, to maintain the confidentiality and security of Confidential Information shall remain in full force and effect during and after the termination of this Agreement.

8.      GOVERNING LAW: The laws of the State of Utah shall govern this Agreement.

9.      ASSIGNMENT.  Inasmuch as this Agreement is primarily intended to be with respect to the provision of personal services by the Consultant, this Agreement shall not be assigned by the Consultant except with the prior written consent of the Company.

10.      WAIVER.  The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

11.      NO ASSIGNMENT.  Neither this Agreement nor any right or obligation hereunder may be assigned by a Party without the consent of any and all other Parties to this Agreement.

12.      COUNTERPARTS; SIGNATURES.  This Agreement may be executed in any number of counterparts, each of which together, with the signature of each Party hereto, shall constitute one and the same agreement.  A signature received by facsimile or electronically shall be deemed to have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

| ALPINE SECURITIES CORPORATION | Gribben & Associates, Inc. |
|---|---|
| By:  Christopher L. Frankel<br>Chief Executive Officer | Steven M. Gribben<br>President |
| 39 Exchange Place<br>Salt Lake City, Utah 84111 | 18201 Von Karman Ave., Suite 300<br>Irvine, California 92612 |
| Telephone: | Telephone: |
| E-mail: | E-mail: |

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send it to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Gribben & Associates, Inc.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☒ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ____

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ____

Exemption from FATCA reporting code (if any) ____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

18201 Von Karman, Suite 300

**6** City, state, and ZIP code

Irvine, CA 92612

Requester's name and address (optional)

**7** List account number(s) here (optional)

*See Specific Instructions on page 2.*
*Print or type*

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | — | | | — | | | | |

or

Employer identification number

| 2 | 0 | — | 0 | 0 | 9 | 3 | 6 | 0 | 8 |

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of
U.S. person ▶                                    Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9.*

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X                                    Form **W-9** (Rev. 12-2014)